2017 WY 92

**John HATHAWAY, Appellant (Defendant),**

**v.**

**The STATE of Wyoming, Appellee (Plaintiff).**

**S-16-0196**

Supreme Court of Wyoming.

August 7, 2017

Representing Appellant: Office of the Public Defender: Diane M. Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel; Kirk A. Morgan, Senior Assistant Appellate Counsel. Argument by Mr. Morgan.

Representing Appellee: Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; Emily J. Soli, Assistant Attorney General. Argument by Ms. Soli.

Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.

KAUTZ, Justice.

[¶1] A jury found John Hathaway guilty of one count of first degree sexual abuse of a minor and one count of second degree sexual abuse of a minor. On appeal, Mr. Hathaway claims the district court should have suppressed his statements to law enforcement because the detective ignored his requests for an attorney; the district court committed plain error by allowing the detective's vouching statements into evidence; the district court abused its discretion by quashing his subpoena duces tecum to the Department of Family Services (DFS); and his sentence on the first degree sexual abuse conviction is illegal.

[¶2] We affirm on Mr. Hathaway's first three issues. However, we reverse and remand for resentencing on Count II. Mr. Hathaway's sentence of thirty-two to thirty-five years on the first degree sexual abuse count is illegal because the minimum term is greater than ninety percent of the maximum term.

## ISSUES

[¶3] Mr. Hathaway raises the following issues on appeal:

1. Did the trial court err[.] as a matter of law when it denied Mr. Hathaway's motion to suppress the statements he

made after he repeatedly informed the investigating detective that he did not want to talk until he had an opportunity to consult an attorney?

2. Did plain error occur[ ] when the State played the police interview of Mr. Hathaway to the jury?

3. Did the district court abuse[ ] its discretion when it quashed a subpoena duces tecum without conducting an *in camera* review of the material?

4. [Is] Mr. Hathaway's sentence [ ] illegal as it violates Wyo. Stat. § 7-13-201?

The State articulates the same issues, although in more detail.

## FACTS

[¶4] During the relevant time, the alleged victim, NC, was between six and eight years old. Mr. Hathaway was involved in a romantic relationship with NC's mother, and the three of them lived together in Cheyenne. Mr. Hathaway moved out of the home in February 2015, and shortly thereafter NC told her grandparents that Mr. Hathaway had touched her inappropriately. NC's grandmother reported her claim to law enforcement on March 20, 2015. A sexual assault nurse examiner examined NC. NC told the nurse that Mr. Hathaway had touched her vagina, rubbed his penis between her legs and put his penis in her mouth.

[¶5] Cheyenne police detective Zachary Johnson contacted Mr. Hathaway at his workplace on March 26, 2015. The detective said that he needed to speak with Mr. Hathaway about some "pretty serious" allegations. Detective Johnson did not initially reveal the exact nature of the allegations, but he told Mr. Hathaway that they involved NC. Although the detective did not formally "arrest" Mr. Hathaway until later in the initial encounter, Mr. Hathaway was in custody the entire time because he was not free to leave. At this point, the detective did not inform Mr. Hathaway of his rights under *Miranda v. Arizona*, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Despite having not been informed of his right to counsel, Mr. Hathaway mentioned an attorney several times during the initial encounter. Mr. Hathaway did not give any incriminating statements during that initial interview.

[¶6] Detective Johnson arrested Mr. Hathaway, took him to the police station, and interviewed him for several hours. At the beginning of the interview, Detective Johnson informed Mr. Hathaway of his *Miranda* rights, and Mr. Hathaway stated that he understood the advisement. The detective then asked if he wanted to "chat" "so we can get your side of this;" and he responded in the affirmative. The detective told Mr. Hathaway that NC reported he had sexual relations with her. Mr. Hathaway denied the allegations. He stated that NC had touched his penis and, when he was asleep, had put it in her mouth, but claimed she initiated all of the encounters. Throughout the interview, Detective Johnson repeatedly stated that he believed NC and did not believe Mr. Hathaway. The detective also stated the evidence showed that the sexual abuse had occurred.

[¶7] The State charged Mr. Hathaway with three counts of first degree sexual abuse of a minor under Wyo. Stat. Ann. § 6-2-314(a)(i) (LexisNexis 2017): "(a) An actor commits the crime of sexual abuse of a minor in the first degree if: (i) Being sixteen (16) years of age or older, the actor inflicts sexual intrusion on a victim who is less than thirteen (13) years of age."

(vii) "Sexual intrusion" means:

(A) Any intrusion, however slight, by any object or any part of a person's body, except the mouth, tongue or penis, into the genital or anal opening of another person's body if that sexual intrusion can reasonably be construed as being for the purposes of sexual arousal, gratification or abuse; or

(B) Sexual intercourse, cunnilingus, fellatio, analingus or anal intercourse with or without emission.

Section 6-2-301(a)(vii) (LexisNexis 2017). The first degree sexual abuse counts included two counts of penile/vaginal intrusion and one count of fellatio. The State also charged Mr. Hathaway with one count of second degree sexual abuse of a minor under Wyo. Stat. Ann. § 6-2-315(a)(ii) (LexisNexis 2017): "(a) Except under circumstance constituting sex-

ual abuse of minor in the first degree as defined by W.S. 6-2-314, an actor commits the crime of sexual abuse of a minor in the second degree if: ... (ii) Being sixteen (16) years of age or older, the actor engages in sexual contact of a victim who is less than thirteen (13) years of age."

> (vi) "Sexual contact" means touching, with the intention of sexual arousal, gratification or abuse, of the victim's intimate parts by the actor, or of the actor's intimate parts by the victim, or of the clothing covering the immediate area of the victim's or actor's intimate parts[.]

Section 6-2-301(a)(vi). The second degree sexual abuse count pertained to Mr. Hathaway's touching and rubbing of NC's vaginal area.

[¶8] Mr. Hathaway filed a motion to suppress statements he made during his interview with Detective Johnson. He claimed that, although he requested an attorney, the detective continued to question him in violation of his constitutional right to counsel. The district court held a hearing and denied the motion to suppress. It concluded that Mr. Hathaway had not made an unambiguous request for counsel.

[¶9] In preparation for trial, Mr. Hathaway served a subpoena duces tecum upon DFS. He sought DFS records regarding NC, her mother, her mother's family, and her father's family. Mr. Hathaway requested that the district court perform an *in camera* review of the DFS records to determine if they contained any evidence of an alternate source of NC's sexual knowledge. Citing the confidentiality of its records, DFS moved to quash the subpoena. The district court quashed the subpoena because the defense did not meet the requirements for *in camera* review of the material.

[¶10] A jury trial commenced on October 19, 2015. During the trial, the jury was shown a video and audio recording of Detective Johnson's full interview with Mr. Hathaway. The jury returned a verdict acquitting him of Counts I and IV, the two counts of first degree sexual abuse based upon penile/vaginal intrusion. It convicted him of Count II, first degree sexual abuse based

upon fellatio, and Count III, second degree sexual abuse for sexual contact.

[¶11] The district court sentenced Mr. Hathaway to serve terms of incarceration of thirty-two to thirty-five years on Count II and eighteen to twenty years on Count III. The sentence on Count III was to be served consecutive to the sentence on Count II. Mr. Hathaway filed a timely notice of appeal.

## DISCUSSION

### 1. Motion to Suppress

[¶12] Mr. Hathaway claims the district court erred by denying his motion to suppress the statements he made to law enforcement. He argues that the statements were obtained in violation of his constitutional rights because Detective Johnson ignored his repeated requests for an attorney. Mr. Hathaway points to five instances during the initial encounter with the detective at his workplace where he claims he requested an attorney: 1) "Do I have to get a lawyer?" 2) "[Y]ou want me to go into a situation without any representation where I'm being accused of something serious." 3) "I need to get a lawyer. I have to get a f***ing lawyer." 4) "I don't know what to do right now and I'm stuck by myself. Okay so I feel like I need an attorney." 5) "I said I wanna talk to you when I talk to my lawyer and get one and so on." The district court refused to suppress Mr. Hathaway's statements to the detective because he did not make an unambiguous request for counsel.

[¶13] The ultimate determination of "[w]hether a statement constitutes an unequivocal request for counsel ... is a question of law," subject to *de novo* review. *Valdez v. Ward*, 219 F.3d 1222, 1232 (10th Cir. 2000). *See also Hadden v. State*, 2002 WY 41, ¶ 17, 42 P.3d 495, 499 (Wyo. 2002). However,

> [f]actual findings made by a trial court considering a motion to suppress will not be disturbed unless the findings are clearly erroneous. Because the trial court has the opportunity to hear the evidence, assess witness credibility, and draw the necessary inferences, deductions, and conclusions, we view the evidence in the light most favorable to the trial court's determination.

*O'Boyle v. State*, 2005 WY 83, ¶ 18, 117 P.3d 401, 407 (Wyo. 2005) (citations omitted). *See also Tibbetts v. State*, 2017 WY 9, ¶ 9, 388 P.3d 517, 520 (Wyo. 2017).

[¶14] Mr. Hathaway claims a violation of his rights under the Fifth and Sixth Amendments to the United States Constitution.[1] The relevant portion of U.S. Const. amend. V protects the individual's right against self-incrimination: "No person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. VI protects an accused's right to counsel: "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defen[s]e." The United States Supreme Court explained the protections afforded by these constitutional provisions in *Miranda*, 384 U.S. at 444-45, 86 S.Ct. at 1612:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

(footnote omitted). If the accused is not advised of these rights, any statements he makes in response to custodial interrogation by law enforcement must be suppressed. *Miranda*, 384 U.S. at 444-45, 86 S.Ct. at 1612-13; *Gunn v. State*, 2003 WY 24, ¶ 7, 64 P.3d 716, 719 (Wyo. 2003). *Compare, Lewis v. State*, 2002 WY 92, 48 P.3d 1063 (Wyo. 2002) (confession made prior to *Miranda* warnings not admissible; however, subsequent confession made after proper warning admissible if it was made knowingly and voluntarily). The obligation applies to the states through the Fourteenth Amendment to the United States Constitution. *Missouri v. Seibert*, 542 U.S. 600, 607-08, 124 S.Ct. 2601, 2607, 159 L.Ed.2d 643 (2004).

[¶15] As stated above, *Miranda* applies to custodial interrogation. The State conceded that, even though he was not immediately arrested, Mr. Hathaway was in custody when Detective Johnson contacted him at his workplace. The next question is whether the detective "interrogated" him during that initial encounter. *Miranda* described "interrogation" as actual "questioning initiated by law enforcement officers." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. Later, the United States Supreme Court clarified the definition, finding that the "goals of the *Miranda* safeguards" could be effectuated only if those safeguards extended to "express questioning" and "its functional equivalent." *Arizona v. Mauro*, 481 U.S. 520, 526, 107 S.Ct. 1931, 1935, 95 L.Ed.2d 458 (1987), citing *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct.

---

1. Mr. Hathaway states that the Wyoming Constitution also supports his position. However, he does not provide the independent state constitutional analysis required for us to consider whether the state constitution provides greater protection than the United States Constitution. *Saldana v. State*, 846 P.2d 604, 622-24 (Wyo. 1993). Therefore, we will limit our discussion to United States Constitution jurisprudence.

1682, 1689, 64 L.Ed.2d 297 (1980). The Court defined "functional equivalent" of express questioning as including "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis,* 446 U.S. at 301, 100 S.Ct. at 1689-90. *See also Pennsylvania v. Muniz,* 496 U.S. 582, 600-01, 110 S.Ct. 2638, 2650, 110 L.Ed.2d 528 (1990).

[¶16] During the initial encounter with Mr. Hathaway, Detective Johnson's questions were vague and he did not inform Mr. Hathaway of the precise nature of the allegations against him. He stated that he was investigating "pretty serious" allegations against Mr. Hathaway with "kind of a lot of evidence behind [them]" and asked for his explanation. The detective clearly was interrogating Mr. Hathaway as his questions, though obscure, were designed to elicit incriminating information. Mr. Hathaway was, therefore, entitled to be warned in accordance with *Miranda.* Given Detective Johnson did not properly advise him until after he had been transported to the police station, *Miranda* and its progeny would have rendered any statement prior to the warnings inadmissible in court. However, Mr. Hathaway's statements during that time were not inculpatory, and the State did not offer the pre-*Miranda* interview into evidence.

[¶17] Under these circumstances, it is not surprising that Mr. Hathaway did not base his suppression argument on the detective's failure to properly advise him of his rights during the initial encounter. Instead, he asserts the statements he made during the interview at the police station should have been suppressed because he unequivocally requested an attorney during that initial encounter and did not later waive his right to counsel.

[¶18] When an accused requests the assistance of counsel, "the interrogation must cease until an attorney is present." *Miranda,* 384 U.S. at 474, 86 S.Ct. at 1628. In *Edwards v. Arizona,* 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378 (1981), the Supreme Court held:

[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

(footnote omitted).

[¶19] *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) set out an objective test to determine whether an accused actually requests counsel.

Invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil v. Wisconsin,* 501 U.S. [171], at 178, 111 S.Ct. [2204] at 2209 [115 L.Ed.2d 158 (1991)]. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning. See *ibid.*

Rather, the suspect must unambiguously request counsel.... Although a suspect need not "speak with the discrimination of an Oxford don," he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect.

*Id.,* 512 U.S. at 459, 114 S.Ct. at 2355 (some citations omitted).

[¶20] Further, although not required, it is good police practice for the officer to clarify whether the accused actually wants an attorney when faced with a questionable request

for counsel. "Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel." *Davis*, 512 U.S. at 461, 114 S.Ct. at 2356. *See also Pena v. State*, 2004 WY 115, ¶¶ 13-14, 98 P.3d 857, 865-66 (Wyo. 2004) (addressing clarification of an ambiguous invocation of the right to silence).

[¶21] In *Hadden*, 2002 WY 41, 42 P.3d 495, we applied the *Davis* standard and determined the district court had properly denied Mr. Hadden's motion to suppress his statements to law enforcement because he had not unequivocally invoked his right to counsel. *Id.*, ¶¶ 20-26, 42 P.3d at 501-04. The detective informed Mr. Hadden of his *Miranda* rights and asked whether he wanted to waive those rights and provide his "side of the story." Mr. Hadden stated, "Um, I mean I do want a lawyer, yes. But I mean, I do, I want to get this on the way. You know, get . . . you know, get this over with. Because I didn't do what I'm being charged for." The detective then asked what Mr. Hadden wanted to do in an attempt to clarify whether he was invoking his right to counsel or not. Mr. Hadden asked if he would "still have the right to a lawyer," and the detective told him "[a]t any time that you want to . . . [s]o if, say, five minutes into this you decide that you won't answer any more questions, all you got to do is say you don't want to answer any more questions, you want a lawyer. The choice is up to you." Mr. Hadden asked how long it would take to get a court-appointed attorney and the detective told him it would take a "little bit of time;" "we're not talking a day or two." Ultimately, Mr. Hadden submitted to the questioning. *Id.*, ¶ 20, 42 P.3d at 501-02. We reviewed *Davis* and cases from across the country, several of which indicated the context of the defendant's statement was important, and ultimately upheld the denial of Mr. Hadden's motion to suppress. We concluded that "[a]t no time during the interview did [Mr.] Hadden ask for an attorney." *Id.*, ¶¶ 22-26, 42 P.3d at 502-04.

[¶22] Mr. Hathaway asserts that he requested an attorney on five separate occasions; however, he admits that his first two statements may have been insufficient under *Davis*—1) "Do I have to get a lawyer?" and 2) "[Y]ou want me to go into a situation without any representation where I'm being accused of something serious." He is correct that those statements are insufficient requests for counsel. In *Hadden*, ¶ 25, 42 P.3d at 504, we relied upon a North Dakota case that concluded the exact language used by Mr. Hathaway in his first statement—"Do I have to get a lawyer?"—was insufficient to invoke the right to counsel. *State v. Greybull*, 1998 ND 102, ¶¶ 8-9, 14-21, 579 N.W.2d 161, 161-64 (N.D. 1998). Mr. Hathaway's second statement about Detective Johnson wanting him to go forward without representation was simply a statement about the detective's intent and was not a request for counsel. Furthermore, the detective immediately corrected Mr. Hathaway by saying, "Hold on I never said you had to go into this without any representation so don't put words in my mouth."

[¶23] Mr. Hathaway asserts that his third statement was clearly a request for an attorney. He stated: "I need to get a lawyer. I have to get a f\*\*\*ing lawyer." Alone, these statements may indicate that he was demanding an attorney. However, they must be viewed in context. *Hadden*, ¶ 25, 42 P.3d at 504. Mr. Hathaway immediately followed those statements by volunteering additional information—"You know I was gonna go with you[.] I was like ok alright. You know I thought it was cuz I went to the house she was gonna say I stole some s\*\*t." Detective Johnson responded:

> Well you know like I don't wanna talk about everything[.] I don't wanna talk about your whole relationship together, but you know like I said that's up to you[.] I'm not gonna twist your arm here. By no means is that what I'm trying to do[.] I'm just trying to give you a chance to chat with me about this.

The detective was not asking specific questions about the allegations at this point in the interview. He was simply trying to clarify

Mr. Hathaway's intent in accordance with *Davis's* recommendation.

[¶24] Mr. Hathaway then indicated that he was finished talking to Detective Johnson and would talk about the allegations "on [his] time." The detective arrested Mr. Hathaway because "there's probable cause this crime was committed." Mr. Hathaway apparently believed he was being arrested because he would not talk. Detective Johnson immediately dispelled that misunderstanding by stating:

> Hold on man[.] I'm not arresting you so you'll talk to me[.] I'm arresting you based on probable cause that [a] felony was committed[.] Okay[,] that's what I'm doing.

[¶25] Detective Johnson continued with the arrest process and said that he would give Mr. Hathaway a chance to talk about his "side of it," but did not question him specifically about the allegations. Mr. Hathaway responded: "Evidence can be explained away. There's reasons ... I just had my entire life flipped upside down. I don't know what to do right now and I'm stuck by myself. Okay[,] so I feel like I need an attorney." A case cited by this Court in *Hadden, Stemple v. State*, 994 P.2d 61, 69 (Okla. Crim. Ct. App. 2000), ruled that an accused's statement that he "feels" like he needs an attorney is not an unequivocal request for an attorney. Furthermore, after Mr. Hathaway made that statement, the detective did not question him about the offense but just reassured him that his angry reaction to being arrested was normal.

[¶26] The last statement[2] posited by Mr. Hathaway as a request for counsel was his statement that "I said I wanna talk to you when I talk to my lawyer and get one and so on." In arguing that this statement was an unequivocal request for counsel, Mr. Hathaway ignores its context: "I said I wanna talk to you when I talk to my lawyer and get one and so on, but like right now I don't wanna go to jail[.] I'm gonna lose my job, I'm gonna lose my dog, I'm gonna lose everything."

Detective Johnson again stated that Mr. Hathaway was being arrested based upon probable cause that he committed a crime. He continued: "Here's the thing John[,] I would still like to talk to you, but you're saying you don't wanna talk to me without your attorney. I wanted to talk to you." After a few more exchanges, Mr. Hathaway indicated that wanted to talk to the detective but believed it was not allowed:

> [Hathaway]: "So I'm not, now I'm going to jail and I'm not allowed to talk to yo[u]."
>
> [Detective]: "If you want an attorney you absolutely have that right. If you wanna talk to me right now you have that right also. So totally up to you."
>
> [Hathaway]: I'm already here can I or am I not allowed to?
>
> [Detective]: Can you do what?
>
> [Hathaway]: Talk to you now.
>
> [Detective]: Okay without an attorney or with an attorney cuz you kinda mentioned both?
>
> [Hathaway]: I have to go to jail[,] try to find an attorney while I'm in jail, try to figure out what's gonna go on with work and stuff while I'm in jail[,] so "yeah I wanna talk to you now.

The context of Mr. Hathaway's statement clearly shows that he was not requesting counsel. In fact, he was asking for permission to speak to the detective without counsel.

[¶27] Like in *Hadden*, the entire conversation between Mr. Hathaway and the detective showed that, although he may have considered requesting an attorney, he was intent on clearing up the situation and did not want to wait for an attorney before he did so. His requests for counsel were equivocal, and the detective properly asked questions to clarify his intent. The district court correctly denied Mr. Hathaway's motion to suppress because he did not make an adequate request for counsel. Given we agree that Mr. Hathaway did not unequivocally request an attorney, we

---

**2.** Although he does not specifically discuss it, Mr. Hathaway made another statement about an attorney during his initial interaction with law enforcement. After he was arrested, he stated: "But you're arresting me for something I didn't do and there's no way to prove that I did and I haven't been able to f\*\*\*ing get an attorney or nothing." Mr. Hathaway's statement was not phrased as a request, and, when read in context, it is clear that he was not invoking his right to counsel.

need not consider whether he subsequently reinitiated contact and waived his right to counsel in accordance with *Edwards, supra.*

### 2. Vouching

[¶28] Mr. Hathaway claims the district court committed plain error by allowing Detective Johnson's interview with him to be played for the jury. During the interview, the detective repeatedly made statements indicating there was sufficient evidence showing Mr. Hathaway was guilty of engaging in sexual activity with NC, he believed NC's accusations, and Mr. Hathaway was lying. Mr. Hathaway claims the detective's testimony amounted to improper vouching evidence.

[¶29] Mr. Hathaway did not object to admission of the interview on the grounds that it included vouching statements. We, therefore, limit our review to a search for plain error. *See Sweet v. State*, 2010 WY 87, ¶ 22, 234 P.3d 1193, 1202 (Wyo. 2010) (using the plain error standard to review vouching issue because defendant did not object on that basis). Plain error is established when: "(1) the record clearly reflects the alleged error; (2) the party claiming the error demonstrates a violation of a clear and unequivocal rule of law; and (3) the party proves that the violation adversely affected a substantial right resulting in material prejudice." *Griggs v. State*, 2016 WY 16, ¶ 81, 367 P.3d 1108, 1132-33 (Wyo. 2016), quoting *Cazier v. State*, 2006 WY 153, ¶ 10, 148 P.3d 23, 28 (Wyo. 2006) (internal citations omitted). *See also Blevins v. State*, 2017 WY 43, ¶ 25, 393 P.3d 1249, 1255 (Wyo. 2017).

[¶30] Mr. Hathaway argues that, applying the principles from *Sweet*, reversal of his conviction is required. In *Sweet*, the investigating officer testified at trial about his experience in investigating crimes involving children and his training in interviewing children. He also testified specifically about his interviews with the defendant and the victim. The officer stated that he felt the victim was truthful when talking to him and that the defendant was not. *Id.*, ¶¶ 17-18, 28, 234 P.3d at 1200-01, 1204-05. The State also played for the jury the recording of the officer's interview with the defendant which included statements indicating that the officer

thought the defendant was lying, the victim was telling the truth, and the defendant was guilty. *Id.*, ¶¶ 11-16, 234 P.3d at 1198-1200. During opening statement at Sweet's trial, the prosecution told the jury to focus on the interview because it was "significant evidence." In closing argument, the prosecution replayed the recording and relied upon the officer's statements in arguing the State's case to the jury. *Id.*, ¶ 32-33, 234 P.3d at 1205-06.

[¶31] We concluded that admission of the vouching evidence violated, in a clear and unequivocal way, this "Court's long-standing rules prohibiting a witness to express opinions about the accused's mendacity and guilt and about the alleged victim's truthfulness and credibility; such statements invade the exclusive province of the jury to determine the credibility of the witnesses and the evidence." *Id.*, ¶ 28, 234 P.3d at 1204-05. *See also Mersereau v. State*, 2012 WY 125, ¶ 46, 286 P.3d 97, 117 (Wyo. 2012). We also determined that the error prejudiced Mr. Sweet because there was a reasonable possibility that the verdict would have been more favorable to him if the error had not been committed. *Sweet*, ¶ 36, 234 P.3d at 1206.

[¶32] The State concedes the first two elements of plain error are satisfied in this case. The record clearly reflects the statements, and the admission of those statements violated a clear and unequivocal rule of law against vouching evidence. However, the parties disagree as to whether Mr. Hathaway was materially prejudiced by the erroneous admission of the evidence.

[¶33] In determining whether Mr. Hathaway was prejudiced, we review the entire record. *Sweet*, ¶ 31, 234 P.3d at 1205; *Pendleton v. State*, 2008 WY 36, ¶ 11, 180 P.3d 212, 216 (Wyo. 2008). To warrant reversal, there must be a reasonable possibility that Mr. Hathaway would have received a more favorable verdict if the evidence had not been admitted. "'[P]erhaps the single most significant factor in weighing whether an error was harmful is the strength of the case against the defendant.'" *Sweet*, ¶ 31, 234 P.3d at 1205, quoting 3B Charles A. Wright, Nancy J. King, Susan R. Klein & Peter J.

Henning, *Federal Practice and Procedure* § 854 at 305 (2d ed.1982). Other factors that may be important in determining prejudice are: "(1) whether the evidence furnished important corroboration of other testimony; (2) whether it related to a material, consequential fact; (3) whether counsel relied on the evidence in argument; (4) whether the evidence was cumulative; and (5) the effect of any instructions given to the jury." *Zabel v. State*, 765 P.2d 357, 362 (Wyo. 1988), citing 1 Weinstein's Evidence, ¶ 103[06] (1986).

[¶34] Mr. Hathaway argues that he was prejudiced because, like in *Sweet*, there were no other witnesses to the crimes and no physical evidence, so the State's case relied entirely upon the credibility of the child victim. His defense was that he did not commit the offenses and claims the prejudicial effect of the improper vouching is clear because the jury convicted him even though NC gave inconsistent accounts of the sexual abuse. He points to the fact that she reported penile/vaginal intrusion to the sexual assault nurse examiner but did not report any instances of anal intrusion. At trial, however, NC testified that Mr. Hathaway touched her with his penis both inside and outside "the butt," but stated that she did not remember him ever touching her vagina with his penis. Mr. Hathaway bolsters his argument by pointing to other evidence showing that NC was not credible. She told her grandparents that he tried to spank her with a belt, but her mother said that was not true. She also testified at trial that she was a werewolf that could see in the dark.

[¶35] The jury acquitted Mr. Hathaway of two of the four counts—Counts I and IV, both involving penile/vaginal intrusion. It convicted him of sexual intrusion by fellatio and sexual contact. The evidence on the two counts for which he was convicted was overwhelming. NC never varied in her description of the fellatio or her general description of Mr. Hathaway touching her vagina. Her trial testimony was consistent with the account she gave to the sexual assault nurse examiner. Furthermore, Mr. Hathaway actually admitted during the interview with Detective Johnson that NC had his penis in her mouth on at least one occasion, although he stated that she had initiated the contact and he was asleep when it first occurred.

[¶36] To further corroborate NC's testimony that the abuse occurred, her grandparents testified that they frequently babysat NC and her behavior changed dramatically during the time when Mr. Hathaway would have been abusing her. She started throwing fits when she had to go home with her mother and hurting herself by pulling out her hair and pulling at her mouth. NC's behavior improved after she reported the abuse to them. Consequently, while the detective's vouching testimony corroborated NC's version of the events, the State presented strong evidence, aside from the detective's testimony, on both counts for which he was convicted. *See Zabel*, 765 P.2d at 362 (important corroborating evidence is a factor in determining prejudice resulting from erroneous admission of vouching evidence, but strength of case is perhaps the most significant factor); *Pendleton*, ¶ 17, 180 P.3d at 218 (finding appellant's argument inadequate to demonstrate prejudice partly because there was a "substantial amount of evidence inculpating" her).

[¶37] There is another important distinction between the case at bar and cases like *Sweet* and *Mersereau*, where we reversed because improper vouching testimony prejudiced the defendants. In each of those cases, the jury was not told that the officers' vouching statements were part of their interrogation technique rather than expressions of their actual beliefs. *Mersereau*, ¶ 52, 286 P.3d at 118; *Sweet*, ¶ 30, 234 P.3d at 1205. Here, the detective explained different interview techniques during his cross-examination at trial. Although he did not expressly address his statements about the victim's and Mr. Hathaway's respective credibility or about the sufficiency of the evidence, the detective indicated that he used various interrogation strategies to see if Mr. Hathaway would "corroborate the information that ha[d] been alleged against him." Detective Johnson explained that his statements to Mr. Hathaway were "not based on any opinion I had or any preconceived notion I had; [they were] simply based on techniques that are legal and wi[de]ly practiced in this country." Those

explanations helped ameliorate the prejudicial effect of the improper vouching evidence.[3]

[¶38] Finally, unlike in *Sweet*, the prosecutor did not use the detective's statements in his arguments to the jury. Thus, the detective's comments on NC's and Mr. Hathaway's credibility were not emphasized by the prosecution. Further reducing the possibility of prejudice, the district court instructed the jury that it was the "sole judge of the credibility of the witnesses and of the weight to be given their testimony."

[¶39] Mr. Hathaway makes another argument in support of his claim that he was prejudiced by the district court's error in allowing the interview into evidence. At trial, the State planned to stop the video recording of the interview shortly before the end so the jury would not hear statements that the charges against Mr. Hathaway were serious felonies. The defense objected, stating that the whole video needed to be shown. The district court apparently granted the defense request and allowed the complete recording to be played for the jury. As a result, the State requested an instruction that the jury should not consider punishment in rendering its verdict. The district court allowed the jury instruction, over a defense objection.

[¶40] On appeal, Mr. Hathaway claims that the instruction further prejudiced his defense. Aside from the fact that Mr. Hathaway actually asked that the portion of the video with the information about the seriousness of the charges be played for the jury prompting the State's request for the instruction about punishment, he does not explain how the instruction was erroneous or how it prejudiced him. Therefore, we decline to address this aspect of Mr. Hathaway's argument because he has presented no cogent argument or pertinent authority to support it. *Willey v. Willey*, 2016 WY 116, ¶ 30, 385 P.3d 290, 299-300 (Wyo. 2016).

[¶41] To summarize, although the district court violated a clear and unequivocal rule of law by allowing the detective's vouching statements into evidence at trial, Mr. Hathaway was not prejudiced. Given the strength of the State's case, the detective's testimony that the statements he made during the interview were part of his interrogation tactics, the prosecution did not use the detective's statements in its argument, and the judge instructed the jury that it was the final arbiter of witness credibility, there is no reasonable possibility that the verdict would have been different if the error had not been committed.

### 3. DFS Subpoena Duces Tecum

[¶42] The Sixth Amendment to the United States Constitution provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to ... be confronted with the witnesses against him [and to] have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. *See also* Wyo. Const. art. 1, § 10. Mr. Hathaway claims the district court violated these constitutional rights when it refused to require DFS to produce privileged records for *in camera* review in response to his subpoena duces tecum.

[¶43] In general, we review a district court's ruling on a motion to quash a subpoena for abuse of discretion. *Schreibvogel v. State*, 2010 WY 45, ¶ 12, 228 P.3d 874, 880 (Wyo. 2010), citing *Wolfe v. State*, 998 P.2d 385, 387 (Wyo. 2000). Under this standard of review, this Court examines "'the reasonableness of the [district] court's choice,' in ruling on the matter." *Id.*, quoting *Gould v. State*, 2006 WY 157, ¶ 8, 151 P.3d 261, 264 (Wyo. 2006). *See also Willey*, ¶ 44, 385 P.3d at 302-03.

[¶44] Prior to trial, Mr. Hathaway served a subpoena duces tecum upon DFS pursuant to W.R.Cr.P.17(d).[4] He sought "any and all in-

---

3. To be clear, we are not suggesting that if the officer testifies his vouching statements are part of his interrogation technique, they are admissible. As we said in *Mersereau*, ¶ 57, 286 P.3d at 119, "[w]hile an officer's accusation that a suspect is lying may be an appropriate and effective interrogation technique, it has no place in a court of law."

4. There is no indication that any DFS records were in the possession, custody and control of the State and, therefore, possibly subject to disclosure under W.R.Cr.P. 16(a)(1)(C).

formation in DFS custody relating to [NC's mother's and father's families] and including any investigations, filed cases, or potential cases involving" NC and her mother for *in camera* review by the district judge.

[¶45] DFS moved to quash the subpoena on the grounds that the information was confidential pursuant to Wyo. Stat. Ann. § 14-3-214 (LexisNexis 2015). Under § 14-3-214, DFS records generally are not accessible because they are confidential. There are, however, specific enumerated exceptions to the rule of non-disclosure. Section 14-3-214 states in relevant part:

(a) All records concerning reports and investigations of child abuse or neglect are confidential except as provided by W.S. 14-3-201 through 14-3-215. . . .

(b) . . . [A]pplications for access to records concerning child abuse or neglect contained in the state agency or local child protective agency shall be made in the manner and form prescribed by the state agency. Upon appropriate application, the state agency shall give access to any of the following persons or agencies for purposes directly related with the administration of W.S. 14-3-201 through 14-3-216:

. . . .

(vi) A court or grand jury upon a showing that access to the records is necessary for the determination of an issue, in which case access shall be limited to in camera inspection unless the court finds public disclosure is necessary.[5]

(footnote added). DFS also asserted that Mr. Hathaway's request was not sufficiently specific and he did not demonstrate that the information was material to his defense.

[¶46] Mr. Hathaway's attorney made the following argument at the hearing on the motion to quash:

Your Honor, without delving too specifically, it is sort of a fine balance between giving the Court enough information to know that this was [not] a fishing expedition, showing our hand a little bit too much, but we would argue that the allegations against Mr. Hathaway are very serious, they are very specific.

[NC] has a degree of sexual knowledge in which we would like to investigate. It's my understanding that there may have been other instances in which we would be able to access DFS records to show an alternate course of sexual knowledge, which is I guess just about as constitutionally material to Mr. Hathaway's defense as it gets.

So specifically looking at just the immediate family, that being her, her mother's family, and her father's family, looking for any sort of investigation for DFS records that would indicate as to how this other sexual knowledge came to be. It is specific and relevant to Mr. Hathaway's defense.

I understand the AG's office [on behalf of DFS] is there to protect the minor child and her information, and that's why we did request an in camera review per the statute for the Court to review if there are relevant documents, which my hunch is there may be some investigations that were open previously, for the Court to review those and disseminate that information as appropriate as the Court sees fit.

I believe that the public interest in protecting the minor child's information in this family is important but not more important than Mr. Hathaway's constitutional right

---

**5.** Both parties to this case seem to agree that, in the right circumstances, § 14-3-214(b)(vi) would allow disclosure of DFS records in a criminal proceeding. Without discussion, this Court apparently reached the same conclusion in *Gale v. State,* 792 P.2d 570, 582-83 (Wyo. 1990). We have never, though, directly addressed whether a party must demonstrate that the access is "for purposes directly related with the administration of W.S. 14-3-201 through 14-3-216 [the child protective services statutes]." The only other case interpreting § 14-3-214(b) is *In re SJJ,* 2005 WY 3, ¶¶ 36-38, 104 P.3d 74, 84 (Wyo. 2005). There, we considered whether it was proper for the district court to admit juvenile court records in a termination of parental rights proceeding. This Court indicated that access to the records under subsection (b)(vi) was proper because it was for "purposes directly related to the administration" of the child protective services statutes and "necessary for the determination of [the] issue" of whether parental rights should be terminated. Because we conclude that, even if § 14-3-214(b)(vi) permits access to confidential DFS records in a criminal case, Mr. Hathaway was not entitled to disclosure in this case, we will not address the meaning of the above-quoted language.

to have a full defense in this defense. I believe the information out there is paramount to his defense.

The district court quashed the subpoena. It stated that "a hunch is certainly far from the degree of specificity that would meet the standard" for allowing *in camera* review of the information.

[¶47] We will start with the procedural question of whether Mr. Hathaway's subpoena was a proper request for materials under W.R.Cr.P. 17(d). A subpoena is not a substitute for discovery in a criminal case. *United States v. Roybal*, 46 F.Supp.3d 1127, 1163 (D. New Mexico 2014). Instead, the right must emanate from a statute, rule or court ruling. *Anderson v. State*, 2014 WY 13, ¶ 12, 317 P.3d 1108, 1113 (Wyo. 2014). Rule 17(d) provides a right to obtain materials prior to trial under certain conditions:

> (d) For *Production of Documentary Evidence and of Objects.*—A subpoena may ... command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. The court may direct that books, papers, documents or other objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents, objects, and portions thereof, to be inspected by the parties and their attorneys.

[¶48] This Court discussed the standards for determining if a subpoena should be quashed because it is unreasonable or oppressive under Rule 17(d) in *Schreibvogel*, ¶ 15, 228 P.3d at 881:

> The leading case in this Court interpreting this standard is *Bowman Dairy Co. v. United States*, 341 U.S. 214, 71 S.Ct. 675, 95 L.Ed. 879 (1951).... [C]ases decided in the wake of *Bowman* have generally followed Judge Weinfeld's formulation in *United States v. Iozia*, 13 F.R.D. 335, 338 (S.D.N.Y.1952), as to the required showing. Under this test, in order to require pro-

duction prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

> [U.S. v.] *Nixon*, 418 U.S. [683] at 698–700, 94 S.Ct. [3090] at 3103 [41 L.Ed.2d 1039 (1974)] (footnotes and emphasis omitted). The Court went on to state that, "[a]gainst this background" the party seeking enforcement of a subpoena, in order to carry his or her burden, had to clear the three hurdles of relevancy, admissibility, and specificity. *Id.* at 700, 94 S.Ct. at 3103.

[¶49] The specificity requirement was comprehensively discussed in *United States v. King*, 164 F.R.D. 542, 545-46 (D. Kan. 1996):

> "Specificity is the hurdle on which many subpoena requests stumble." [U.S. v.] *Jackson*, 155 F.R.D. [664] at 667 [ (D.Kan. 1994) ]. "This requirement ensures that the subpoenas are used only to secure for trial certain documents or sharply defined groups of documents." *Id.* It also serves to prevent the subpoena from being converted into a license for what the Supreme Court in *Bowman Dairy Co. v. United States*, 341 U.S. 214, 221, 71 S.Ct. 675, 679, 95 L.Ed. 879 (1951), decried as a "fishing expedition to see what may turn up." ...

> In describing the documents, the subpoena must refer to specific documents or, at least, to specific kinds of documents. 2 Charles A. Wright, *Federal Practice and Procedure* § 275 at 159 (1982). Requesting entire files instead of specific documents indicates a fishing expedition.

(some citations omitted). The Tenth Circuit stated in *United States v. Morris*, 287 F.3d 985, 991 (10th Cir. 2002) that the court is not required to conduct an *in camera* review of information when the subpoena lacks the required specificity. Failure to comply with the

specificity requirement will compel quashing a subpoena even when the information sought "appears highly relevant and is arguably admissible." *Id.*

[¶50] The district court stated that Mr. Hathaway's subpoena was not sufficiently specific. Applying the above standards, we agree. Mr. Hathaway requested that the district court review *in camera* "any and all information in [DFS] custody" pertaining to NC, her mother, her mother's family, and her father's family. This request was for an "entire file" which "indicates a fishing expedition." *Id.*

[¶51] Mr. Hathaway claims his request was sufficiently specific because it only included records involving NC's immediate family; however, the subpoena actually sought all records involving her extended family. In addition, DFS records could include any number of things including allegations of neglect, physical abuse, and/or sexual abuse. Contrary to defense counsel's argument, Mr. Hathaway's request was not limited to records pertaining directly to NC's sexual knowledge. Mr. Hathaway's subpoena for all DFS records pertaining to NC, her mother, her mother's family and her father's family was a " 'fishing expedition to see what may turn up,' " which is not allowed. *King,* 164 F.R.D. at 545, quoting *Bowman Dairy,* 341 U.S. at 221, 71 S.Ct. at 679.

[¶52] Mr. Hathaway cites two cases which he asserts establish a lower burden to prompt *in camera* review by the trial court—*United States v. Ruedlinger,* 172 F.R.D. 453 (D. Kan. 1997) and *Burns v. State,* 968 A.2d 1012 (Del. 2009). In *Ruedlinger,* 172 F.R.D. at 457, the federal district court stated that "[g]enerally, courts conduct *in camera* review[ ] of the requested material to decide if the three hurdles are satisfied." Mr. Hathaway latches on to that statement as meaning that the district court should have conducted an *in camera* review in this case, apparently without regard to the specificity of his request. That interpretation ignores the rest of the discussion in *Ruedlinger.*

In describing the documents, the subpoena must refer to specific documents or, at least, to specific kinds of documents. 2

Charles A. Wright, *Federal Practice and Procedure* § 275 at 159 (1982). Requesting entire files instead of specific documents indicates a fishing expedition. *United States v. Reed,* 726 F.2d 570, 577 (9th Cir.), *cert. denied,* 469 U.S. 871, 105 S.Ct. 221, 83 L.Ed.2d 151 (1984). The specificity hurdle, however, cannot be cleared by simply naming the title of the document. *United States v. Arditti,* 955 F.2d 331, 345–46 (5th Cir.), *cert. denied,* 506 U.S. 998, 113 S.Ct. 597, 121 L.Ed.2d 534 (1992). The moving party must specify why the materials are wanted, what information is contained in the documents, and why those documents would be relevant and admissible at trial. *See Arditti,* 955 F.2d at 345–46.

"Conjecture and speculation will not provide the lift to carry a movant over the three hurdles." *Jackson,* 155 F.R.D. at 668. Without detailed information on the requested documents, a court is only left "to speculate as to the specific nature of their contents and its relevance." *Arditti,* 955 F.2d at 346. In *Nixon,* the [successful] movant provided sworn testimony from the participants in the recorded conversations and supplied reasons from which rational inferences could be drawn on the relevance of the tapes. 418 U.S. at 700, 94 S.Ct. at 3103–04. Generally, courts conduct *in camera* reviews of the requested material to decide if the three hurdles are satisfied. *Arditti,* 955 F.2d at 347 (Goldberg, J., concurring). If the movant, however, fails to make a threshold showing of a specific demand for relevant and admissible material, then the court may deny the request without conducting an *in camera* review. *Id.* at 348.

*Ruedlinger,* 172 F.R.D. at 456-57.

[¶53] It is clear that Mr. Hathaway did not satisfy *Ruedlinger's* threshold for *in camera* review. His request for "any and all" information in DFS custody did not describe with any degree of particularity what materials he wanted. Nor, did he explain with specificity why the materials would be relevant and admissible at trial. Consequently, *Ruedlinger* does not help Mr. Hathaway's cause.

[¶54] In *Burns*, the Delaware Supreme Court considered Mr. Burn's appeal of his convictions for sexually abusing a child. He sought issuance of a subpoena to the victims' therapist for *in camera* review of their privileged therapy records. The court stated that the defendant needed to make a " 'plausible showing' that the records sought are material and relevant," but it also stated that the defendant "still must establish specifically what kinds or categories of records [he] is seeking." *Burns*, 968 A.2d at 1025. The court held that Mr. Burns was entitled to *in camera* review of the therapist's records because he sought only factual information that he could use to impeach the victims based upon the following circumstances: 1) the crimes had occurred years before the trial; 2) the victims had made arguably inconsistent statements; 3) the victims had made detailed notes of the abuse which they destroyed after their forensic interviews; and 4) the victims had "presumably discussed their interviews at length with their therapist." *Id.* at 1026. The court concluded inconsistencies in the victims' statements could be discerned only through *in camera* review of the factual information contained in the girls' therapy records. *Id.* at 1022-26.[6] Unlike Mr. Burns, Mr. Hathaway did not attempt to limit his request to certain documents or types of information and did not show, with any particularity, the relationship between the privileged information and his defense.

[¶55] The district court's decision to quash the subpoena duces tecum also indicated that Mr. Hathaway did not demonstrate that the evidence sought was sufficiently material to justify *in camera* review of privileged DFS records. In *Pennsylvania v. Ritchie*, 480 U.S. 39, 55-61, 107 S.Ct. 989, 1000-03, 94 L.Ed.2d 40 (1987), the Supreme Court discussed the tension between a criminal defendant's right to compulsory process under the Sixth Amendment and the victim's right to preserve the confidentiality of privileged information. It stated that the compulsory process clause guarantees, at a minimum, that "criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." *Id.*, 480 U.S. at 56, 107 S.Ct. at 1000. However, that right must be balanced against the public interest in protecting confidential materials. *Id.*, 480 U.S. at 57-58, 107 S.Ct. at 1001.

[¶56] The Supreme Court adopted a due process analysis, focused on fundamental fairness, to determine if the defendant's right under the Sixth Amendment compulsory clause requires disclosure of otherwise privileged material. In deciding whether the defendant was entitled to privileged information, the Supreme Court turned to the familiar standard set out in *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), which requires disclosure of evidence favorable to the accused and material to guilt or punishment. *Ritchie*, 480 U.S at 57, 107 S.Ct. at 1001. The determination of whether information is constitutionally material is made under the standards set out in *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (opinion of Blackmun, J.): "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Ritchie*, 480 U.S. at 57, 107 S.Ct. 989. *See also Gale*, 792 P.2d at 580.

[¶57] In *Gale*, 792 P.2d at 581-82, this Court upheld the district court's denial of *in camera* review of the victim's psychiatric records and juvenile court records involving the family.[7] We held that the requests did not satisfy the requirements of showing the records existed or were material to the defense.

---

6. The *Burns* decision discussed the Rule 17 and *Ritchie* requirements, described below, together.

7. *Gale* also discussed the defendant's right to records compiled by D-PASS, the predecessor to DFS. Although that discussion has some relevance here because of the application of § 14-3-214, the district court actually conducted an *in camera* review of those materials in *Gale*. *Gale*, 792 P.2d at 582. The discussion of whether Mr. Gale was entitled to *in camera* review of privileged psychiatric and juvenile court records is more comparable to the situation we have in this case.

Mr. Gale had the opportunity to question the psychiatrist about the existence of psychiatric records, but did not do so. Defense counsel also admitted his request for such records was speculative. *Id.* With regard to the juvenile court records, this Court ruled that the defendant failed to establish that any material records existed despite having been given the opportunity to call witnesses who would have information about the juvenile court proceedings. *Id.* at 585-86.

[¶58] Here, there was less of a showing of materiality. Defense counsel did not call any witnesses or produce any information indicating that DFS records existed or would be material to Mr. Hathaway's defense. Instead, defense counsel said she had a "hunch" there may have been some DFS "investigations that were open previously." Defense counsel also asserted she needed the "DFS records to show an alternate course of sexual knowledge" which would be "just about as constitutionally material to Mr. Hathaway's defense as it gets." Even accounting for the difficulty facing a defendant in learning about confidential materials so he can make a proper request, the threshold requirement for constitutional materiality requires more than a hunch that some vague type of record may exist or a conclusory statement that the information is constitutionally material. *See generally United States v. Burger,* 773 F.Supp. 1419, 1425 (D. Kan. 1991) (stating that conclusory statements are insufficient to trigger *in camera* analysis). Defense counsel did not explain the basis for her hunch or even how information about NC's "sexual knowledge" would impact the trial.

[¶59] In fact, NC did testify on cross examination about other instances of sexual abuse she had suffered at the hands of a cousin and uncles. She also testified that she had witnessed her aunt (who was younger than she) being abused. Mr. Hathaway mentioned the abuse by NC's cousin during his interview with Detective Johnson. Obviously, the defense was aware of at least some of the allegations of prior abuse but chose not to provide that information to the district court to support the subpoena. Given the lack of specificity in the subpoena and the defense's failure to make a showing that the informa-

tion sought was constitutionally material, the district court did not abuse its discretion by quashing the subpoena duces tecum.

### 4. Illegal Sentence

[¶60] Mr. Hathaway asserts that his sentence on Count II of thirty-two to thirty-five years is illegal under Wyo. Stat. Ann. § 7-13-201 (LexisNexis 2017) because the minimum term is greater than ninety percent of the maximum term. Section 7-13-201 states:

Except where a term of life is required by law, or as otherwise provided by W.S. 7-13-101, when a person is sentenced for the commission of a felony, the court imposing the sentence shall not fix a definite term of imprisonment but shall establish a maximum and minimum term within the limits authorized for the statute violated. The maximum term shall not be greater than the maximum provided by law for the statute violated, and **the minimum term shall not be** less than the minimum provided by law for the statute violated, nor **greater than ninety percent (90%) of the maximum term imposed.**

[¶61] The State agrees that Mr. Hathaway's sentence is illegal under § 7-13-201. Consequently, we reverse Mr. Hathaway's sentence and remand for the district court to resentence him in accordance with the law.

### CONCLUSION

[¶62] The district court did not err by denying Mr. Hathaway's motion to suppress his statements to law enforcement because he did not unequivocally request an attorney. Although the district court erred by allowing the detective's improper vouching statements into evidence, Mr. Hathaway was not prejudiced. It is not reasonably possible that Mr. Hathaway would have received a more favorable verdict if the evidence had not been admitted. The district court did not abuse its discretion by quashing Mr. Hathaway's subpoena duces tecum. He did not meet the specificity requirement of Rule 17(d) and did

not establish the requested information was constitutionally material. Mr. Hathaway is entitled to be resentenced on Count II because the minimum term is greater than 90 percent of the maximum term, in violation of § 7-13-201.

[¶63] Affirmed in part and reversed and remanded in part for further proceedings consistent with this decision.