# IN THE SUPREME COURT, STATE OF WYOMING

# 2021 WY 89

APRIL TERM, A.D. 2021

August 4, 2021

DENNIS KARL KLINGBEIL,

Appellant
(Defendant),

v.

S-20-0213

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Park County*
*The Honorable Bill Simpson, Judge*

*Representing Appellant:*
> Office of the State Public Defender: Diane Lozano, Wyoming State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Lauren McLane, Director, Defender Aid Clinic; Andrew Sickenberger, Student Director; Brenna Fisher, Student Intern. Argument by Ms. Fisher.

*Representing Appellee:*
> Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General. Argument by Mr. Eames.

*Before FOX, C.J., and DAVIS\*, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

*GRAY, J., delivers the opinion of the Court; KAUTZ, J., files a specially concurring opinion.*

*\* Chief Justice at time of oral argument.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**GRAY, Justice.**

[¶1]    Dennis Klingbeil claimed he shot his wife in the head by accident.  The jury rejected his defense and convicted him of first-degree murder.  Mr. Klingbeil appeals, arguing the district court abused its discretion in admitting improper W.R.E. 404(b) evidence of a 911 call and surrounding events from 2011.  Mr. Klingbeil also asserts plain error based on the prosecutor's question eliciting the opinion of the forensic pathologist that the cause of death was homicide.  Mr. Klingbeil argues this improper opinion testimony materially prejudiced his defense.  We affirm.

*ISSUES*

[¶2]    The issues are:

1. Did the district court abuse its discretion when it admitted W.R.E. 404(b) evidence surrounding a 911 call which occurred in 2011?

2. Did the State elicit improper opinion testimony from the forensic pathologist resulting in prejudicial error?

*FACTS*

[¶3]    Dennis and Donna Klingbeil were married for thirty-four years and together forty-three years.[1]  On August 5, 2018, the Klingbeils returned to their ranch outside of Cody, Wyoming, from a truck-buying trip in Billings, Montana.  By ten o'clock that night, Dennis had shot Donna once in the head and had overdosed on pills.  Donna was life-flighted to the Billings hospital where she died about a half-hour later.  Dennis was transferred to the Cody hospital where he recovered.  Upon his release, he was charged with first-degree murder.

**A.    Evidence at Trial**

**1.  The Prosecution**

[¶4]    A five-day jury trial began on August 5, 2019.  The State called numerous witnesses including law enforcement officers, dispatchers, the Klingbeils' two sons, and the forensic pathologist who conducted the autopsy.  The Klingbeil family consisted of

---

[1] We use Dennis and Donna Klingbeil's first names when reciting the facts to avoid confusion between the various family members and refer to them formally as Mr. Klingbeil and Mrs. Klingbeil in the discussion.

1

Dennis, Donna, and two adult children—Brad Lanken, a son from Donna's first marriage, and Mark Klingbeil, a son from Dennis' first marriage. Donna had another son who committed suicide in early 2011, and a daughter who succumbed to cancer in 2002.

[¶5] Brad and Mark were in frequent contact with Dennis and Donna and testified about the family dynamics at trial. Both sons testified that throughout the previous year, their parents had been contentiously negotiating the separation of assets from their 1986 Trust into two independent trusts of equal value. The couple owned numerous properties in Cody, Wyoming, and Miami, Florida. Donna believed Dennis was secretly moving money from joint businesses and placing it in a personal safe.

[¶6] Throughout 2018, trust revision negotiations were ongoing and the Klingbeils' relationship continued to disintegrate. By April 2018, divorce had become a topic of discussion. In May 2018, at his mother's request, Brad contacted a divorce attorney as well as an independent trust attorney for her. Dennis talked to Brad about the possibility of divorce in June 2018. He relayed that he had contacted a divorce attorney, although he did not want a divorce because he loved Donna and wanted to spend the rest of his life with her.

[¶7] While both sons attempted to help their parents resolve their financial disagreements, Brad became Dennis and Donna's primary contact. In June, the couple reached a partial financial settlement that included their respective responsibilities for specific bills on the properties and a monthly payment from Dennis to Donna of $6,000 for management fees. This agreement did not resolve trust matters, and Dennis and Donna continued to argue about the trusts with increasing frequency and vitriol. Alcohol consumption commonly preceded their arguments.

[¶8] The events of the days immediately preceding the shooting were presented through Brad's testimony covering a series of phone calls. On August 3, 2018, Donna telephoned Brad and told him she had gone with Dennis to his attorney's office to sign quitclaim deeds placing the Wyoming properties, excluding the Cody ranch, in Donna's Trust. She explained she had not read the deeds as she and Dennis were headed to Billings, Montana, to buy a truck, and she planned to read them when she returned to Cody. The next day, Dennis telephoned Brad telling him that he and Donna had found a truck, but Donna was upset because the payment was more than her current lease. To please her, Dennis agreed to pay the difference, even though he felt it was unfair given the agreement requiring him to pay other bills. On August 5, Donna told Brad that she and Dennis were heading back to Cody.

[¶9] Donna called Brad again around 4:30 p.m. that same day. She had read the deeds and was distraught because they incorrectly identified Dennis as a trustee for her trust. She indicated that Dennis was calling his attorney to have the deeds corrected, immediately. During this call, she was simultaneously berating Dennis. At about 6 p.m.,

Donna telephoned Brad again whispering that she was in the garage. She asked Brad to get her a plane ticket to Chicago because she could not remain in Cody any longer—she was leaving Dennis. Brad thought she had been drinking and told her he would get her a ticket first thing in the morning.

[¶10] Jessie Colegrove, the Park County 911 dispatcher, testified she received a call from the Klingbeil residence at 7:42 p.m. that same evening, but the caller hung up. Dispatcher Colegrove immediately called back and spoke to Donna, and on being reassured there was no emergency, ended the call without dispatching officers to the home.

[¶11] At 8 p.m., Donna made her final call to Brad. She told him a meeting had been set for Monday to straighten out the deeds and asked about an e-mail Brad had sent to Dennis earlier that day. In that e-mail, Brad had suggested the valuation of the proposed trusts needed to be changed because of a reallocation of the Cody ranch property to Dennis. In response to Donna's questions, Brad shared his opinion that the disparity in the trust values was $600,000. Donna then summoned Dennis to the phone. As Donna handed the phone to Dennis, Brad could hear her shouting at Dennis, "You know, you're trying to cheat me." Dennis told Brad abruptly that his calculations were wrong and said, "I'm finished talking about this trust. I'm going to put an end to this tonight. Here, talk to your mother."

[¶12] Brad told Donna he thought they reached an impasse on the trusts. He listened as Donna screamed "hateful things" at Dennis, and Dennis yelled back. During this exchange, Donna told Dennis that she was leaving him and going to Chicago. Brad asked what Dennis was doing, and Donna said he was sitting on the couch staring at the wall.

[¶13] Mark testified that Dennis called him at 9:43 p.m. and said, "I shot Donna and she's dead. I took some . . . sleeping pills and I'll be gone soon or dead soon. Please send someone out to take care of the dog." Mark called 911, and after being told to call local law enforcement, he located the Park County Sheriff's Office number online. He called the sheriff's office at 9:51 p.m. and then called Brad.

[¶14] Park County Sheriff Scott Steward and Deputy J.J. Schwindt testified they arrived at the Klingbeil home around 10:18 p.m. They found Donna lying on the floor, face up, with her legs straight out and Dennis face down approximately two feet from Donna. The officers observed a .38 caliber gun on the dining table. The gun had been fired once. A spent bullet was on the floor by the fireplace. The officers found pill bottles in the kitchen. A forensic analysis of the gun revealed it was in good condition and functioning as intended. No defect was found that would cause the weapon to accidentally discharge.

[¶15]  The State presented evidence of recorded jail telephone calls between Dennis and various individuals.  Dennis originally had said he could not remember anything about that night.  But later, he told varying versions of the evening's events to different people.  In several conversations, he said, "[I] just snapped."  In one call, he told Mark's wife that he was going to go for the defense of temporary insanity.  On September 16, 2018, Dennis told Mark and Brad that Donna was sitting in a chair next to him when the gun accidently went off.  In no conversation did Dennis say he was contemplating suicide prior to the shooting.

[¶16]  The State called Dr. Thomas Bennett, the forensic pathologist who conducted Donna's autopsy.  Dr. Bennett testified that the cause of death was a perforated (in and out) gunshot wound entering Donna's right temple and exiting her left temple.  She had bruising on her lower eyelid from the close-range nature of the gunshot wound but no other assault wounds.

[¶17]  An external examination revealed the size of entrance wound matched the bullet found on the floor of the Klingbeil home.  Dr. Bennett explained that when there is space between a gun muzzle and a person's skin, gun powder spreads in a cone shape in the skin surface.  This is called "stippling."  Had there been any gap between gun and skin, stippling would have been present.  Dr. Bennett saw no stippling.  He observed what may have been a small muzzle imprint around the entry but could not definitively identify it as such.  He concluded the gun was touching the skin when fired.

[¶18]  Internal observations supported this conclusion.  Extensive skull damage and gunpowder stain on the inside of the skull confirmed the gun was against Donna's head when fired.  The entry wound was not angled.  It was straight-on perpendicular to the skin surface.  There were no indications that the gun was inches from Donna's skull when fired.  In Dr. Bennett's opinion, there was no question that this was a "contact wound."

[¶19]  Dr. Bennet testified that, based on the physical evidence and after consultation with other coroners present at the autopsy, he ruled Donna's death a homicide.  The prosecutor then made a follow-up inquiry:

> Q.      When you rule on the manner of death, could you also call it an "accident," if you believe that was the correct diagnosis?
>
> A.      Absolutely.  It's up to our investigation, the circumstances and so forth.  "Accident" is possible to rule, if we felt it was an "accident."
>
> Q.      Your ruling was homicide.

4

A. It was.

The defense did not object to this line of questioning. The State rested its case.

## 2. The Defense

[¶20] Dennis testified in his defense. He stated that he was disappointed the night of the shooting because he felt Brad's proposed changes to the trust valuations were undoing work already done. Dennis testified that accusations he was trying to cheat Donna were untrue. Dennis explained that when he told Brad "[he] was going to end all this tonight," he meant he was going to kill himself. He said he was sitting on the couch while he talked to Brad, and "[he] just kind of went blank." Dennis testified:

> The next thing I recall, I was sitting in the dining room and I had a gun in my hand . . . . I was on the dining room chair and [Donna] was at my knees at some point in time, leaning up against my knee and at other times resting on her arm. [I had a gun and] I was just kind of playing with it, I turned the cylinder and such and just was kind of handling it—I didn't really do anything.
>
> .   .   .
>
> I cocked the gun and I put it up alongside my head, . . . and my wife was like beside right in front of me. . . . She asked me if I was going to kill myself that [n]ight. . . . I said, "I don't know." . . . I remember that I was putting the gun back down and at the same time I was trying to put the hammer back in the safety position, and all of a sudden the gun went off. . . . [I]t startled me—and then I looked and I saw my wife fall backwards. . . . At that time, I stood up and said something—I think I said "oh, my God." I put the gun on the table and I walked over to my wife and I shook her arm and there wasn't any movement. . . . I went back to the table and I looked at the gun again and I thought I would shoot myself and I—I hadn't been able to do it in the past and—and then I saw there was a vial of pain pills . . . . [I]t was Oxycodone . . . . I went to the kitchen and took a handful of it . . . [a]nd then I remembered that I had sleeping pills in my bedroom . . . and I went in and I took the entire vial of Ambien . . . . I came out and at that point I was already feeling . . . tired or something and I saw my dog and I called my son in Florida and told him what had happened and . . . could he please come up and take care of the dog.

5

[¶21] The defense called two witnesses from the Billings car dealership who testified they saw no animosity between Dennis and Donna while they shopped for a new truck. Dennis' business lawyer testified that he spoke with Dennis on August 5, 2018, about the inaccuracies in the quitclaim deeds and tentatively promised a revision by Monday, the next day. The lawyer could hear Donna in the background and characterized her tone of voice as "excited."

[¶22] The final witness for the defense was Ronald Scott, an independent forensic consultant. Mr. Scott rendered expert testimony on "unintentional discharge" of a firearm. An "unintentional" or "involuntary inadvert" discharge occurs when a "firearm discharges, but there is not an intention for it to do [so]." He did not use the term "accidental" because accidental technically pertains to the gun itself—there is something defective about the design of the gun in an accidental shooting. Mr. Scott opined that the "common denominator in unintentional discharges starts with a violation of firearms safety. . . . Keep[] in mind that if you didn't have your finger on the trigger, the gun . . . wouldn't discharge." According to Mr. Scott, research has shown that people who are trained and experienced with guns can experience an unintentional discharge, especially in military and police situations.

[¶23] The jury returned a verdict of guilty on August 9, 2019. Dennis was sentenced to life without parole or commutation on November 21, 2019.

## B.    W.R.E. 404(b) Hearing

[¶24] Prior to trial, Dennis filed a demand for notice of the State's intent to introduce evidence under W.R.E. 404(b). In response, the State identified deputies who had personal knowledge of an incident which occurred at the Klingbeils' home in 2011. Donna had called 911 to report that she and Dennis had been drinking and arguing and that Dennis had a pistol. The State provided the police reports. It specified the evidence would be used to prove motive, intent, and lack of accident as justification.

[¶25] The matter was heard with other pretrial motions on May 6, 2019. Dennis argued the 911 incident from 2011 was too remote in time to be admissible and was not relevant to his defense that Donna's death was accidental.

[¶26] The district court concluded evidence of the 2011 incident was admissible. After applying the required *Gleason* analysis, the court determined the evidence was offered for a proper purpose—to show motive, intent, and lack of mistake or accident. It found the evidence was relevant to show a pattern of behavior and lack of accident. The district court then weighed the probative value of the evidence against its possible prejudice. It determined that—because the incident clearly occurred, the evidence was not cumulative, the defendant's actions were not reprehensible in relation to the murder charge, the incident was similar to the charged crime, and it was unlikely the jury would draw

6

improper inferences relating to the charged murder—the evidence was admissible. The district court offered to give a limiting instruction if the defense requested one. No limiting instruction was requested.

[¶27]  At trial, Dispatcher Mona Horman testified she received the call from Donna at 8:21 p.m. on May 19, 2011.  She dispatched officers to the scene and kept Dennis and Donna on the telephone while the officers responded.  Her notes reflect that Dennis said he was sitting at the dining room table with a loaded .45 caliber gun.  He opined that Donna was mentally unstable after the recent suicide of her son.  Later, in the same call, Donna told the dispatcher that Dennis had gone to the living room and left the gun on the table.  He had told Donna that they were going to get a divorce because she had called 911.  Donna also told the dispatcher that Dennis was hiding money from her.

[¶28]  Deputies Schwindt and Thomas Ehlers Jr. testified that in 2011, on their arrival at the Klingbeil residence, the gun was on the table.  Deputy Schwindt spoke with Donna in the garage while Deputy Ehlers interviewed Dennis in the house.  Donna told Deputy Schwindt that while at dinner, Dennis disclosed he had secretly given Mark money to put in a private safe.  Donna explained this upset her, given the Klingbeils' long-term marriage, mutual financial dealings, investments, and properties.  She said that she and Dennis had argued, touching on potential divorce.  Then Dennis had become quiet and Donna went to the garage to get a drink.  When she returned, Dennis was sitting at the table with a gun.  He would not talk to her.  She became worried and called 911.  Donna told Deputy Schwindt it was only an argument—there were no threats of physical violence; Dennis had not pointed the gun at her or made any comments about using the gun.

[¶29]  Dennis told Deputy Ehlers he and Donna had gone to dinner where they had both been drinking.  They returned home and started discussing finances.  Donna became hostile, accusing Dennis of hiding money from her.  Dennis told Deputy Ehlers that Donna's biological son had killed himself earlier that winter, and Donna was emotionally distraught.

[¶30]  The Klingbeils were apologetic about the call.  The deputies left after determining the situation had resolved and there was no need for further action.

## DISCUSSION

I.      *Did the district court abuse its discretion when it admitted W.R.E. 404(b) evidence surrounding a 911 call which occurred in 2011?*

[¶31]  On appeal, Mr. Klingbeil asserts the district court abused its discretion in the admission of the May 19, 2011 incident and the admission materially prejudiced his defense.

7

## A.    Standard of Review

[¶32]  "We review evidentiary rulings for abuse of discretion."  *Mitchell v. State*, 2020 WY 142, ¶ 17, 476 P.3d 224, 231 (Wyo. 2020) (citing *Gonzalez-Chavarria v. State*, 2019 WY 100, ¶ 11, 449 P.3d 1094, 1096 (Wyo. 2019)).  "Evidentiary rulings are within the sound discretion of the trial court and include determinations of the adequacy of foundation and relevancy, competency, materiality, and remoteness of the evidence." *Spence v. State*, 2019 WY 51, ¶ 42, 441 P.3d 271, 282 (Wyo. 2019) (quoting *Overson v. State*, 2017 WY 4, ¶ 26, 386 P.3d 1149, 1154 (Wyo. 2017)).  We will not disturb the trial court's determination of the admissibility of evidence unless the court clearly abused its discretion.  *Spence*, ¶ 42, 441 P.3d at 282 (quoting *Overson*, ¶ 26, 386 P.3d at 1154).  We need only determine whether the court could have reasonably concluded as it did. *Hardman v. State*, 2020 WY 11, ¶ 11, 456 P.3d 1223, 1227 (Wyo. 2020); *Overson*, ¶ 26, 386 P.3d at 1154.  If we find the evidence was admitted in error, then we consider whether the error was prejudicial.  *Dixon v. State*, 2019 WY 37, ¶ 40, 438 P.3d 216, 231 (Wyo. 2019).

[¶33]  We review decisions on the admissibility of 404(b) evidence in two parts; first for abuse of discretion, assuming the court performed some sort of analysis under the *Gleason* framework.[2]  *Mitchell*, ¶ 20, 476 P.3d at 232; *Blanchard v. State*, 2020 WY 97,

---

[2] "In *Gleason*, we set forth factors that the district court must examine to determine the admissibility of 404(b) evidence, and we required the court to articulate its findings."  *Garrison v. State*, 2018 WY 9, ¶ 11, 409 P.3d 1209, 1213 (Wyo. 2018).  These *Gleason* factors are:

1.   How clear is it that the defendant committed the prior bad act?
2.   Does the defendant dispute the issue on which the state is offering the prior bad acts evidence?
3.   Is other evidence available?
4.   Is the evidence unnecessarily cumulative?
5.   How much time has elapsed between the charged crime and the prior bad act?

. . . The trial court should [then] weigh [the following] factors against the probative value of the evidence:

1.   The reprehensible nature of the prior bad act.   The more reprehensible the act, the more likely the jury will be tempted to punish the defendant for the prior act.
2.   The sympathetic character of the alleged victim of the prior bad act. Again, the jury will be tempted to punish the defendant for the prior act if the victim was especially vulnerable.
3.   The similarity between the charged crime and the prior bad act.  The more similar the acts, the greater is the likelihood that the jury will draw the improper inference that if the defendant did it once, he probably did it again.
4.   The comparative enormity of the charged crime and the prior bad act.  When the prior act is a more serious offense than the charged crime,

8

¶ 19, 468 P.3d 685, 691–92 (Wyo. 2020) (citing *Gleason v. State*, 2002 WY 161, 57 P.3d 332 (Wyo. 2002)). Second, if we find error, or if the first prong is unreviewable because no analysis occurred, our inquiry turns to whether the admission was prejudicial. *Blanchard*, ¶ 19, 468 P.3d at 691–92 (citing *Broberg v. State*, 2018 WY 113, ¶¶ 16, 19, 428 P.3d 167, 171–72 (Wyo. 2018)).

## B.   Analysis

[¶34]  The State claims the 2011 incident was relevant because it was very similar to the events of August 5, 2018. It asserts the 2011 incident was not too remote in time, and Mr. Klingbeil's introduction of a gun into a fight about finances made the incident probative of lack of mistake, motive, and intent.

[¶35]  On appeal, Mr. Klingbeil concedes that the district court identified necessary *Gleason* factors but argues it failed to support its findings with substantive analysis. He claims the district court's findings were merely the "shotgun approach" discredited in *Gleason*:

> In future cases involving the admissibility of evidence under W.R.E. 404(b), the record shall reflect the trial court's identification of the purpose or purposes for admission of the evidence, the findings and conclusions establishing relevance and probative value, and the factors considered in balancing probative value against the potential for unfair prejudice. The "shotgun approach" of listing every conceivable purpose for admissibility, followed by a bald statement that probative value outweighs prejudicial effect will no longer be sufficient. While the trial court need not make an express finding on every factor . . . , the record must contain sufficient findings to support the trial court's conclusions.

*Gleason*, ¶ 30, 57 P.3d at 343.

---

the introduction of that act will tend to place the defendant in a different and unfavorable light.
5.   The comparable relevance of the prior bad act to the proper and forbidden inferences. Evidence of the prior bad act may be much more probative of bad character than it is of any legitimate inference permitted by Rule 404(b).
6.   Whether the prior act resulted in a conviction. The jury may be tempted to punish the defendant if they believe he escaped punishment for the prior bad act.
*Gleason v. State*, 2002 WY 161, ¶ 27, 57 P.3d 332, 342–43 (Wyo. 2002) (citations omitted).

[¶36]   Here, the district court identified the specific purposes (motive, intent, and lack of mistake) for which the evidence was offered.   It determined the 2011 incident was sufficiently similar to the shooting at issue in trial, thus relevant for the offered purposes. It weighed the probative value against potential prejudice, explaining its decision to tip the scale in favor of admission.   The evidence and argument forming the basis of the district court's findings, provide an "adequate record" to determine whether the "trial court abused its discretion in considering the required factors." *Mayhew v. State*, 2019 WY 38, ¶ 27, 438 P.3d 617, 624 (Wyo. 2019).

[¶37]   Mr. Klingbeil argues the incidents were not similar because there was no threat of violence in 2011, and the evidence was cumulative given the considerable testimony that the Klingbeils fought heatedly over finances.   These complaints do not establish the district court abused its discretion.

[¶38]   "A trial court abuses its discretion when it could not have reasonably concluded as it did." *King v. State*, 2013 WY 156, ¶ 7, 315 P.3d 639, 643–44 (Wyo. 2013) (quoting *Munoz v. State*, 2013 WY 94, ¶ 3, 307 P.3d 829, 830 (Wyo. 2013)).   "In this context, 'reasonably' means sound judgment exercised with regard to what is right under the circumstances and without being arbitrary or capricious." *King*, ¶ 7, 315 P.3d at 643–44 (quoting *Munoz*, ¶ 3, 307 P.3d at 830).   The district court determined the 2011 incident— producing a gun in an argument over finances, after consuming alcohol, and which led Mrs. Klingbeil to call law enforcement—was sufficiently similar to the events of August 5, 2018, for the purpose of showing intent and lack of mistake.   It determined that— because the incident clearly occurred, the evidence was not cumulative, the defendant's actions were not reprehensible in relation to the murder charge, the incident was similar to the charged crime, and it was unlikely the jury would draw improper inferences relating to the charged murder—the evidence was admissible.   We find no clear abuse of discretion in the court's determination.[3]

## II.   *Did the State elicit improper opinion testimony from the forensic pathologist resulting in prejudicial error?*

[¶39]   Mr. Klingbeil maintains that the State's questions to Dr. Bennett, about his determination that the cause of death was homicide and not an accident, elicited improper expert medical testimony directly refuting Mr. Klingbeil's defense and implying his guilt.

---

[3] Even were we to find an abuse of discretion, Mr. Klingbeil cannot show he was prejudiced by the admission of the W.R.E. 404(b) evidence.   As discussed in the following section, the overwhelming evidence in this case precluded a reasonable probability of a more favorable verdict in the absence of this evidence.

Where there is no objection at trial, our review is for plain error. *Bogard v. State*, 2019 WY 96, ¶ 18, 449 P.3d 315, 321 (Wyo. 2019).

## A.    Standard of Review

[¶40]  "Plain error exists if the alleged error: (1) 'clearly appears in the record'; (2) 'clearly and obviously violates a clear and unequivocal rule of law'; and (3) affects a defendant's 'substantial right to his material prejudice.'" *Leners v. State*, 2021 WY 67, ¶ 23, 486 P.3d 1013, 1018 (Wyo. 2021) (quoting *Grater v. State*, 2020 WY 102, ¶ 7, 468 P.3d 1116, 1118 (Wyo. 2020)).  "Failure to establish each element . . . precludes a finding of plain error." *Lewis v. State*, 2018 WY 136, ¶ 13, 430 P.3d 774, 777 (Wyo. 2018) (quoting *Jackson v. State*, 891 P.2d 70, 74 (Wyo. 1995)).

## B.    Analysis

[¶41]  As we stated in *Nielsen v. State*:

> It is well established that it is the jury's role to determine the guilt of the accused and a witness may not express an opinion as to his guilt.  Although it is proper under W.R.E. 704 for an opinion to embrace[] an ultimate issue to be decided by the trier of fact, it is the jury's duty to resolve the factual issues and ultimately determine guilt or innocence.  The inquiry as to whether expert testimony is proper must focus upon whether the expert testimony serves to assist the jury in resolving the factual issues before it.  Opinion testimony about guilt does not address areas that assist the jury in resolving factual issues.  However, [t]estimony need not be excluded unless it contains an actual conclusion about the guilt or innocence of the accused party, and a witness may interpret evidence even though that interpretation may be important in establishing an element of the crime and thus leading to the inference of guilt.

*Nielsen v. State*, 2018 WY 132, ¶ 26, 430 P.3d 740, 748–49 (Wyo. 2018) (internal citations and quotation marks omitted).

[¶42]  The State contends the prosecutor's questions were proper because the questions were directed to Dr. Bennett's medical diagnosis and not his opinion as to Mr. Klingbeil's guilt.  Mr. Klingbeil asserts that Dr. Bennett's opinion that the death was homicide was not a "medical diagnosis" as there was no argument that Mrs. Klingbeil died from a gunshot wound.  Mr. Klingbeil argues that the ultimate question for the jury

11

was whether the gun was fired accidentally or purposefully, and Dr. Bennett's opinion improperly usurped the jury's role.[4]

[¶43] We need not resolve these arguments here. "Where appropriate, we address the prejudice element of the plain error test first, without addressing whether there has been a violation of a clear and unequivocal rule of law." *Leners*, ¶ 23, 486 P.3d at 1018 (quoting *Lewis*, ¶ 13, 430 P.3d at 777); *Nielsen*, ¶ 23, 430 P.3d at 748; *Dumas v. State*, 2018 WY 120, ¶ 28, 428 P.3d 449, 456 (Wyo. 2018); *Miller v. State*, 2015 WY 68, ¶ 8, 350 P.3d 264, 266 (Wyo. 2015); *Jackson*, 891 P.2d at 74. "[T]he appellant must establish he suffered material prejudice from the error by demonstrating it is reasonably probable he would have received a more favorable verdict if the error had not been made." *Leners*, ¶ 24, 486 P.3d at 1018 (quoting *Weston v. State*, 2019 WY 113, ¶ 37, 451 P.3d 758, 768 (Wyo. 2019) (citing *Sindelar v. State*, 2018 WY 29, ¶ 20, 416 P.3d 764, 770 (Wyo. 2018))). Mr. Klingbeil "must show prejudice under 'circumstances which manifest inherent unfairness and injustice or conduct which offends the public sense of fair play.'" *McGinn v. State*, 2015 WY 140, ¶ 13, 361 P.3d 295, 299 (Wyo. 2015) (quoting *Phillips v. State*, 2007 WY 25, ¶ 8, 151 P.3d 1131, 1134 (Wyo. 2007)).

[¶44] "In determining whether [a defendant] was prejudiced, we review the entire record." *Hathaway v. State*, 2017 WY 92, ¶ 33, 399 P.3d 625, 634–35 (Wyo. 2017).

> [T]his Court balances the following factors: "1) the severity and pervasiveness of the misconduct; 2) the significance of the misconduct to the central issues in the case; 3) the strength of the State's evidence; 4) the use of cautionary instructions or other curative measures; and 5) the extent to which the defense invited the misconduct."

*McGinn*, ¶ 16, 361 P.3d at 299–300 (citations omitted).

[¶45] Examining the first factor, the alleged error was neither severe nor pervasive. Dr. Bennett stated that if the evidence had warranted a finding of accidental death, he and the coroners could have so stated. He then affirmed their ruling was homicide. His statement was not mentioned again either through testimony or in closing argument. *See Hathaway*, ¶ 33, 399 P.3d at 634–35 (important factors include "whether counsel relied on the evidence in argument").

---

[4] *See Nielsen*, ¶ 26, 430 P.3d at 749 ("[T]estimony need not be excluded unless it contains an actual conclusion about the guilt or innocence of the accused party, and a witness may interpret evidence even though that interpretation may be important in establishing an element of the crime and thus leading to the inference of guilt." (internal citations and quotation marks omitted)).

[¶46]   We look next at factor two (the significance of the misconduct) and factor five (the extent to which the defense invited the misconduct).   Mr. Klingbeil argues these factors weigh in his favor as Dr. Bennett's testimony went to the ultimate issue in this case, and the defense did not invite it.   Even if we were to accept Mr. Klingbeil's position as to factors two and five, the third factor tips the scale.   Under the third factor, Mr. Klingbeil must show "it is reasonably probable he would have received a more favorable verdict if the error had not been made." *Leners*, ¶ 24, 486 P.3d at 1018 (quoting *Weston*, ¶ 37, 451 P.3d at 768 (citing *Sindelar*, ¶ 20, 416 P.3d at 770)).   "[P]erhaps the single most significant factor in weighing whether an error was harmful is the strength of the case against the defendant." *Hathaway*, ¶ 33, 399 P.3d at 634–35 (quoting *Sweet v. State*, 2010 WY 87, ¶ 31, 234 P.3d 1193, 1205 (Wyo. 2010) (quoting 3B Charles A. Wright et al., *Federal Practice and Procedure* § 854, at 305 (2d ed. 1982))).

[¶47]   The State introduced evidence that the gun was in good working condition and without a defect which would cause the gun to discharge accidentally.   Testimony from Brad and Mark described the ongoing disintegration of the relationship between Mr. and Mrs. Klingbeil over their financial affairs.   The Klingbeils had been in heated arguments throughout the day of the murder.   Mr. Klingbeil told Brad he was going to "end" it that night.   When Mr. Klingbeil called Mark the night of the shooting and said he killed Mrs. Klingbeil, there was no mention of accident or mistake.   In later conversations with various people, he never alleged the shooting was accidental.   Instead, his versions of events were inconsistent and contradictory, ranging from a claim of temporary insanity to "I don't remember."

[¶48]   Dr. Bennett's testimony, supported by physical evidence, was unrefuted.   Based on an external and internal examination, the evidence led to one conclusion—the gun was fired straight onto the head while held against the skull.   As Dr. Bennett testified, "The gun was held tightly against [her] skin surface when this shot was fired, the gun perpendicular to the skin surface."

[¶49]   Even absent the evidence of the 911 call from 2011 or the challenged testimony of Dr. Bennett, it is not reasonably probable that the jury would have returned a verdict more favorable to Mr. Klingbeil.   The sons' testimony—of their parents' increasing animosity, Mr. Klingbeil's shifting stories, and the physical evidence of a close contact gunshot wound—was sufficient to secure the jury's verdict.

## *CONCLUSION*

[¶50]   The district court did not abuse its discretion in admitting the evidence of the 911 call from 2011.   There is no reasonable probability that, absent the prosecutor's question to Dr. Bennett on cause of death, the verdict would have been more favorable to Mr. Klingbeil.   Affirmed.

13

**KAUTZ, Justice,** specially concurring**.**

[¶51] I concur with the majority opinion. However, I write separately because the standard of review applied by the majority impliedly accepts Mr. Klingbeil's claim that the State committed prosecutorial misconduct. The circumstances of this case do not support even an implied conclusion of prosecutorial misconduct. Nevertheless, I believe the more appropriate neutral standard of review also leads to a conclusion of no prejudice. As noted in Paragraphs 39-41 of the majority opinion, the real issue in this case is whether Dr. Bennett, the State's expert pathologist, expressed an improper opinion that Mr. Klingbeil was guilty of the charged crime when he testified the manner of death was a homicide rather than an accident. This is not a classic prosecutorial misconduct case, but a standard claim that plain error occurred when a witness expressed an ultimate opinion on the defendant's guilt. It was, if anything, a simple trial error.

[¶52] Due process is the underpinning of prosecutorial misconduct jurisprudence. For a prosecutor's conduct to rise to the level of prosecutorial misconduct, it must violate the defendant's due process right to a fair trial. *United States v. Gabaldon,* 91 F.3d 91, 93 (10th Cir. 1996) ("When prosecutorial misconduct deprives a criminal defendant of a fair trial, the defendant's due process rights are violated, and reversal is warranted." (citing *Greer v. Miller,* 483 U.S. 756, 765, 107 S.Ct. 3102, 3108-09, 97 L.Ed.2d 618 (1987); *Berger v. United States,* 295 U.S. 78, 89, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935); *United States v. Lowden,* 900 F.2d 213, 217 (10th Cir. 1990))). *See also,* 16C C.J.S. *Constitutional Law* § 1727 (2021) ("Prosecutorial misconduct or prosecutor's comments and remarks in a criminal trial may deprive the accused of due process of law where they are so prejudicial as to deny the accused a fair trial.") (footnotes omitted).

[¶53] We have defined prosecutorial misconduct as "'[a] prosecutor's improper or illegal act (or failure to act), esp[ecially] involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment.'" *Craft v. State,* 2013 WY 41, ¶ 13, 298 P.3d 825, 829 (Wyo. 2013) (quoting *Black's Law Dictionary* 1237 (7th ed. 1999)) (other citations omitted).

> The term prosecutorial misconduct implies willful and dishonest behavior. If any other lawyer or judge makes a mistake, it is called "error" or "ineffective assistance." Many errors committed by a prosecutor in any given trial are the result of a good faith belief in the status of the law or may be an unintentional act committed in the heat of battle at trial. This does not necessarily mean that the conduct is intentional or unethical.

Warren Diepraam, *Prosecutorial Misconduct: It is not the Prosecutor's Way,* 47 S. Tex. L. Rev. 773, 776 (2006) (footnotes omitted).

14

[¶54] As the special concurrence in *McGinn* noted, "prosecutorial misconduct is something more than evidentiary error." *McGinn v. State,* 2015 WY 140, ¶ 50, 361 P.3d 295, 306 (Fox, J., concurring) (citation omitted). A prosecutor's actions or statements are not misconduct unless he "knew or should have known [they] would deprive the defendant of the right to a fair trial[.]" *Id.,* ¶ 52, 361 P.3d at 307. Justice Fox (now Chief Justice) explained:

> There is a solid body of Wyoming case law establishing the type of conduct that constitutes prosecutorial misconduct, which typically falls into a handful of types of conduct:
>
> > [W]e have said that prosecutors are not to inject into the trial their personal beliefs as to the credibility of the evidence. *Moe [v. State],* 2005 WY 58, ¶ 21, 110 P.3d [1206,] 1214 [(Wyo. 2005)] and *Lane [v. State],* 12 P.3d [1057,] 1065 [(Wyo.2000)]. We have also repeatedly said that prosecutors should not suggest that a defendant carries any burden of proof. *Id.* at 1066 (citing *Harper v. State,* 970 P.2d 400, 405 (Wyo.1998)). And it is not appropriate for a prosecutor to argue to a jury that it is the jury's duty to convict the defendant. *Lafond v. State,* 2004 WY 51, ¶ 25, 89 P.3d 324, 332 (Wyo.2004); *Burton v. State,* 2002 WY 71, ¶ 50, 46 P.3d 309, 321 (Wyo.2002); *See also [United States v.] Sanchez,* 176 F.3d [1214,] 1224 [(9th Cir.1999)].
>
> *Seymore v. State,* 2007 WY 32, ¶ 20, 152 P.3d 401, 410 (Wyo.2007), *abrogated by Granzer v. State,* 2008 WY 118, 193 P.3d 266 (Wyo.2008). It is prosecutorial misconduct: to vouch for the credibility of witnesses, *Fennell v. State,* 2015 WY 67, ¶¶ 31–44, 350 P.3d 710, 719–26 (Wyo.2015); to ask the jury to convict a defendant for any reason other than the evidence before it, *Mazurek v. State,* 10 P.3d 531, 542 (Wyo.2000); to comment upon an accused's silence "when used to the state's advantage either as substantive evidence of guilt or to suggest to the jury that the silence was an admission of guilt," *Abeyta v. State,* 2003 WY 136, ¶ 11, 78 P.3d 664, 667 (Wyo.2003) (citation omitted); to suggest that he has independent knowledge of facts that could not be

presented to the jury, *Talley v. State,* 2007 WY 37, ¶ 21, 153 P.3d 256, 263 (Wyo.2007); to use voir dire to prove the elements of the case or to invite the jury to emotionally sympathize with the victim, *Law v. State,* 2004 WY 111, ¶ 34, 98 P.3d 181, 194 (Wyo.2004); to "launch personal attacks against defense counsel to inflame the passions and prejudices of the jury," *Lafond v. State,* 2004 WY 51, ¶ 39, 89 P.3d 324, 336–37 (Wyo.2004) (citation omitted); to ask the jury to place themselves in the position of the victim, *Trujillo v. State,* 2002 WY 51, ¶ 13, 44 P.3d 22, 27 (Wyo.2002); to intentionally misstate the evidence, *Bustos v. State,* 2008 WY 37, ¶ 9, 180 P.3d 904, 907 (Wyo.2008); to suggest the jury should consider the defendant's fate rather than focusing on its fact finding responsibility, *Haynes v. State,* 2008 WY 75, ¶¶ 26–28, 186 P.3d 1204, 1210–11 (Wyo.2008); and to ask "was she lying" questions (*see* majority opinion at ¶ 17).

*McGinn,* ¶ 51, 361 P.3d at 306-07 (Fox J., concurring). *See also,* Michael T. Fisher, Note, *Harmless Error, Prosecutorial Misconduct, and Due Process: There's More to Due Process than the Bottom Line,* 88 Colum. L. Rev. 1298, 1303 (1988) ("Although the range of possible prosecutorial misconduct is coextensive with the span of the criminal justice system, from initial investigation to sentencing, some generalizations are possible. Most criminal appeals that raise a claim of prosecutorial misconduct generally focus on either the prosecutor's failure to disclose material evidence, or on statements made by the prosecutor during the trial or sentencing proceeding.") (footnotes omitted).

[¶55]   There is nothing in this case indicating the prosecutor knew or should have known asking the expert about the manner of death was necessarily improper or done in bad faith.   In fact, there is a reasonable argument Dr. Bennett's testimony was admissible. *See Neilsen v. State,* 2018 WY 132, ¶¶ 26-35, 430 P.3d 740, 748–52 (Wyo. 2018) (experts' opinions the victim's injuries were consistent with child abuse and non-accidental trauma, which refuted Neilsen's defense of accident, were not inadmissible opinions on his guilt).   Similarly, whether Mrs. Klingbeil's death was or was not an accident was an issue in this case, and the opinion of an expert may have been helpful to the jury. *See id.*   Dr. Bennett's opinion of "homicide" did not determine Mr. Klingbeil's state of mind or whether he was guilty of the crime charged.

> "Homicide is the "killing of one human being by the act, procurement, or omission of another." Black's Law Dictionary 734 (6th ed.1990). Similar definitions of homicide are found in Webster's Third New International Dictionary, Unabridged, at 1083 (Philip B. Gove ed., 1986) and The Random House Dictionary of the English Language,

Unabridged, at 914 (2d ed.1987) both of which define homicide as "a killing of one human being by another." In fact, the term homicide descended originally from the Latin term "homicidium" meaning "killing." The Random House Dictionary of English Language, Unabridged, at 914 (2d ed.1987). Significantly,

> "Homicide is not necessarily a crime. It is a necessary ingredient of the crimes of murder and manslaughter, but there are other cases in which homicide may be committed without criminal intent and without criminal consequences.... The term 'homicide' is neutral; while it describes the act, it pronounces no judgment on its moral or legal quality."

Black's Law Dictionary 734 (6th ed.1990)

*Sippio v. State,* 350 Md. 633, 654–55, 714 A.2d 864, 875 (1998).

[¶56]  By allowing Mr. Klingbeil to phrase the issue as one of prosecutorial misconduct rather than evidentiary or trial error the majority is led to the incorrect test for prejudice. *McGinn's* test applies when we can review the prosecutor's misconduct in context of the entire trial.  The prosecutor repeatedly asked McGinn whether his daughter was lying when she said he had hit her and made her cry.  *McGinn,* ¶ 8, 361 P.3d at 297-98.  The State conceded the questioning was improper because "[i]t is misconduct for the prosecutor to cross-examine a defendant using the 'lying' or 'mistaken' technique (*i.e.,* well, then if 'so-and-so' said 'such-and-such,' was he 'mistaken' or 'lying?')."  *McGinn,* ¶¶ 15-16, 361 P.3d at 299 (citations and some internal quotation marks omitted).  In analyzing whether McGinn was prejudiced by the improper questioning, we applied the following test:

> To determine whether prosecutorial [mis]conduct was harmless, this Court balances the following factors: 1) the severity and pervasiveness of the misconduct; 2) the significance of the misconduct to the central issues in the case; 3) the strength of the State's evidence; 4) the use of cautionary instructions or other curative measures; and 5) the extent to which the defense invited the misconduct.

*Id.,* ¶ 16, 361 P.3d at 299-300 (citations and quotation marks omitted).

17

[¶57] Given the alleged error in this case does not meet the definition of prosecutorial misconduct, the correct test is for prejudice arising from the improper admission of evidence, as set out in *Hathaway v. State*, 2017 WY 92, ¶ 33, 399 P.3d 625, 634-35 (Wyo. 2017). To warrant reversal, there must be a reasonable possibility the defendant would have received a more favorable verdict if the evidence had not been admitted. *Id.* Factors important in determining prejudice include: "'(1) whether the evidence furnished important corroboration of other testimony; (2) whether it related to a material, consequential fact; (3) whether counsel relied on the evidence in argument; (4) whether the evidence was cumulative; and (5) the effect of any instructions given to the jury.'" *Id.* (quoting *Zabel v. State,* 765 P.2d 357, 362 (Wyo. 1988)) (other citations omitted). "[P]erhaps the single most significant factor in weighing whether an error was harmful is the strength of the case against the defendant." *Id.* (citation and quotation marks omitted).

[¶58] While there is some obvious overlap between the two tests for prejudice, the factors from *McGinn* look at the effect of the **prosecutor's** conduct on the fairness of the trial. The factors in the *Hathaway* test focus on the effect of the **erroneous admission of the evidence** on the result of the trial. These distinctions may be subtle, but they are important when we consider the focus of a claim for prosecutorial misconduct is on the improper actions of the prosecutor rather than an improper evidentiary ruling.